FINE AND OTHERS, Respondents, v. THE ST. LOUIS PUBLIC SCHOOLS AND OTHERS, Appellants.

1. The entries made in *Livre Terrein* upon the margin of the records of Duralde's Spanish surveys of common field lots, showing an abandonment of those lots and a re-uniting them to the king's domain," are admissible in evidence, in a suit founded on an alleged confirmation by the act of Congress of June 13, 1812, to show that under the Spanish government it was not unusual for the inhabitants to abandon their possessions.

*Appeal from St. Louis Land Court.*

This was an action commenced in the year 1854, in the nature of an action of ejectment, to recover possession of an undivided interest in a lot of one by forty arpens in the St. Louis common field. The defendants were the Board of President and Directors of the St. Louis Public Schools, the City of St. Louis, and about eighty others, who hold in severalty and not in common. The St. Louis Public Schools and several other defendants answered plaintiffs' petition, and entered into an agreement with the plaintiffs by which it was stipulated, among other things, that the issue between plaintiffs and the Public Schools might be tried, and in case a verdict should be rendered in favor of plaintiffs, a general judgment should be entered against the Public Schools and all the defendants who were parties to the agreement. Plaintiffs claimed title as heirs and legal representatives of Philip Fine, to whom the lot in controversy is alleged to have been confirmed by the act of Congress

of June 13, 1812; and it was admitted that the plaintiffs are the heirs and legal representatives of said Philip Fine to the extent of an interest of three undivided twenty-eighths of all the right, title and interest of the said Philip Fine in and to the tract of land described in plaintiffs' petition. In proof of cultivation and possession of the lot in controversy by the said Fine prior to December 20th, 1803, plaintiff introduced the oral testimony of two witnesses, Antoine Smith and François Noisé. This testimony tended to show that the said Philip Fine was in possession of and cultivated the tract of land in controversy prior to December 20th, 1803; that he possessed and cultivated the same up to the time of the falling down of the fence, about six years before the change of government, when he removed from St. Louis to the mouth of the Maramec river, where he continued to reside until his death. No documentary evidence of any concession or grant from the Spanish government was presented by plaintiffs. It was admitted that the premises in controversy lie within the outboundary lines of the town (now city) of St. Louis, as surveyed, marked, and established by the surveyor general of Illinois and Missouri in the year 1840, so as to include the out-lots, common field lots, and commons thereto belonging, in pursuance of the act of Congress of June 13, 1812. There was evidence bearing upon the question of location, which it is unnecessary to set forth.

The defendants adduced in evidence surveys No. 379 and 380, by which the land in controversy was designated and set apart in the usual form for the support of schools by the surveyor general. Defendants offered to read in evidence certified copies from *Livre Terrein* of surveys, made by Martin Duralde, between 1770 and 1772, by authority of the Spanish government, of all the common field lots lying north of the premises in controversy in the same common field, with the entries on the margin of the record of each survey in *Livre Terrein* in the following form in each case: "Reuni au domaine du Roy pour les avoir abandonné depuis longtems. St. Louis, le 4 Juin, 1793. [Signed] Z. Trudeau." "Re-united to

the domain of the king for having abandoned these arpens since a long time. St. Louis, the 4th of June, 1793. Z. Trudeau." On the objection of plaintiffs, these copies of surveys, with the marginal entries signed by the lieutenant governor of the province, were ruled out as inadmissible. It also appeared from the testimony of Mr. Renard, the U. S. recorder of land titles, introduced by defendants, that the premises in controversy had never been surveyed by the United States until surveyed and assigned to the schools.

The court, on its own motion, gave the following instructions : " 1. In order to enable the plaintiffs to recover in this action, it must appear in evidence to the satisfaction of the jury, that Philip Fine did, prior to the 20th day of December, 1803, inhabit, cultivate and possess the land in question, and that he, or those representing his interests, continued to claim the same as a lot or out-lot, or common field lot, in, adjoining, or belonging to the town of St. Louis, after the said 20th of December, 1803, and down to the passage of the act of Congress of June 13, 1812. 2. Abandonment presents a question of fact and intention. If the party have only a naked possession, and leave the possession voluntarily, this is abandonment. If he have possession coupled with a right, title or claim to the land, the mere quitting of possession is not necessarily an abandonment ; therefore, if it be proven that Fine left the possession of the land when the common fence fell down, his motive and intention in leaving the possession are proper objects for the consideration of the jury. And if it appear to the jury that, after leaving the land, he still considered it his own, and exercised acts of ownership over it, or continued to assert his right, title, or claim to it down to the 13th of June, 1812, then the act of Congress of that date confirmed the title to him, and the title so confirmed is better than the title of the school board shown in evidence." To the giving of which the defendants excepted.

The court gave the following instructions, on the motion of defendants : " 3. Unless the jury shall be able from the evi-

dence satisfactorily to ascertain and fix the location and boundaries of the lot of land claimed to have been cultivated and possessed by said Philip Fine, prior to the 20th day of December, 1803, and to identify said lot as being the same land now sued for in this case, they will find for the defendants. 4. If the jury find that Philip Fine abandoned the possession of the lot in question and removed from St. Louis prior to the 20th December, 1803, and that neither he nor any person under him did retake possession of said lot, or lay claim thereto up to or at the time of the passage of the act of Congress of 13th June, 1812, then neither the said Fine, nor any person representing him, acquired any right or title to the premises by force of said act of Congress ; and the jury will find for defendants."

The court refused the following instructions asked for by defendants : " 1. If the jury believe from the evidence that prior to the 20th day of December, 1803, the said Philip Fine abandoned the possession of the lot cultivated by him, and removed from the town of St. Louis to the Maramec, permanently ceasing to be an inhabitant of said town, and that he did not again become an inhabitant of said town prior to the time of the passage of the act of Congress of 13th June, 1812, nor retake possession of said lot, nor exercise any acts of ownership or claim over the same up to that date, they will find for the defendants. 2. The jury are instructed that the United States surveys of lots Nos. 1482 and 1483, called the Tayon lot and the Sarpy lot, are only *prima facie* evidence of the location and boundaries of those lots now, as between the government and the owners of those lots, and all persons claiming those lots against the present owners thereof ; but that they do not of themselves alone furnish any evidence of the location and boundaries of the lot which Philip Fine is supposed to have cultivated prior to the 20th day of December, 1803. 3. Unless the jury are fully satisfied from the evidence, that the said Philip Fine, under whom the plaintiffs claim, did, prior to the 20th day of December, 1803, inhabit or cultivate and possess the identical land in the petition mentioned and described, as an

out-lot or common field lot, adjoining or belonging to the town or village of St. Louis, claiming the same for himself under the authority or by permission of the French or Spanish government, they will find for the defendants."

The jury found for plaintiffs. The defendants bring the case to this court by appeal.

*E. Casselberry*, for appellants.

I. The first instruction asked for by the defendants and refused by the court was improperly refused. The act of 1812 does not purport to confirm rights to any one except to the inhabitants of the "respective towns or villages."

II. The court erred in refusing the second and third instructions asked for defendants.

III. The court erred in ruling out as inadmissible the copies of Duralde's surveys, with the marginal entries made by the lieutenant governor.

IV. The court erred in giving instructions numbered 1 and 2. (See generally Guitard v. Stoddard, 16 How. 412 ; Coke on Littleton, 250, 252 ; Hughes v. McAllister & Co. 15 Mo. 302 ; Vasseur v. Benton, 1 Mo. 222, 296 ; Lajoye v. Primm, 3 Mo. 368 ; Janis v. Gurno, 4 Mo. 458 ; Gurno v. Janis, 6 6 Mo. 330 ; Beihler v. Coonce, 9 Mo. 347 ; Montgomery v. Landusky, 9 Mo. 705 ; Page v. Scheibel, 11 Mo. 167 ; Harrison v. Page, 16 Mo. 182 ; Soulard v. Allen, 18 Mo. 590 ; Soulard v. Clark, 19 Mo. 570 ; 11 How. 96 ; 12 How. 434, 222, 223 ; 13 How. 3 ; 15 How. 29 ; 4 Peters, 480 ; Clark v. Courteney, 5 Pet. 354 ; Barclay v. Howell, 6 Pet. 513 ; United States v. Arredondo, 6 Pet. 743 ; Elliott v. Pearly, 10 Pet. 442 ; Ewing v. Bernet, 11 Pet. 51 ; United States v. Mitchell, 9 Pet. 734, 760 ; New Orleans v. United States, 10 Pet. 718 ; Sigerson v. Pomeroy & Andrews, 13 Mo. 620.)

*Todd* and *Krum & Harding*, for respondents.

I. The copies from *Livre Terrein*, offered by defendants and excluded from the jury on the objection of the plaintiffs, were not competent testimony. The surveys copied from *Livre Terrein* all lie north of the premises in question, and they neither

proved nor tended to prove abandonment by Philip Fine of his claim of possession of the land sued for. The survey and marginal entries from *Livre Terrein* only show the parties named (not Fine) had abandoned their claims and possessions; and no inference can be drawn from them that Fine had done so, or that his land had been re-united to the king's domain.

II. The instructions given to the jury at the instance of the defendants and on the court's own motion, embody the whole law arising upon the facts of the case. The case shows that there was evidence before the jury touching every proposition embraced in these instructions. The law was laid down to the jury as pointedly and strongly as the defendants had a right to ask. The questions of *claim, possession, cultivation, abandonment, location* and *boundaries,* which were the essential elements of the case, were left to the jury under proper direction of the court. (Landis v. Perkins, 12 Mo, 238 ; Salle dit Lajoye v. Primm, 3 Mo. 530 ; Page v. Scheibel, 11 Mo. 183.)

III. The instructions asked by the defendants and refused are not law. The first instruction refused asserts the rule that the act of Congress of 13th June, 1812, does not operate to confirm any right or title to the premises in question, by reason of possession, cultivation, &c., unless the claimant up to and at the time of the passage of the act, was an *inhabitant* of the town of St. Louis. In other words, that, although Fine, prior to 1803, and up to the passage of the act of 1812, may have claimed cultivation and possessed the premises in question, yet, if he was not an inhabitant of St. Louis at the time of the passage of the act, his claim is not confirmed. This, surely, can not be the law. The second instruction refused is but a commentary on parts of the testimony, and should have been refused for that reason. Besides, this instruction was calculated to mislead the jury. If surveys 1482 and 1483 are *prima facie* evidence of the location of the land mentioned in those sur-· veys, and if the witnesses, in fixing the location and boundaries of the premises in question, refer to those surveys, then they are some evidence, and tend to show the true location of

the premises sued for. To have given this instruction would have been error. The whole substance, that is law of the third instruction refused, is embraced in the instructions given by the court. There is, then, no error in the refusal of the court to give these three instructions.

SCOTT, Judge, delivered the opinion of the court.

We have no hesitation in expressing our dissatisfaction with the verdict in this case ; and, but for the rule which restrains this court from reversing a judgment for the refusal of the court below to grant a new trial on the ground that a verdict is against the weight of evidence, we would readily remand this cause for another trial. In speaking of the early construction the act of the 13th of June, 1812, had received, that oral evidence of inhabitation, cultivation or possession prior the 20th December, 1803, would prove a title under its provisions, this court remarked that no inconvenience can result from adhering to the received construction of the act. A claim, now for the first time presented, disconnected with any possession, and relying solely on proof of inhabitation, cultivation or possession prior to the 20th December, 1803, to defeat another title, would not receive much consideration, and might, without any apprehension of injurious consequence, be submitted to the consideration of a jury acting under the direction of the court. (Soulard v. Clark, 19 Mo. 582.) This was said in a case on which the defendant was in possession claiming under the act of 1812. It was supposed that a party then presenting his claim for the first time under the act of 1812, after so long a delay, having failed to make any proof under the act of 26th May, 1824, would stand in a very different situation from that occupied by him who was in possession, defending under the act of 1812. The court did conceive that a claimant, under such circumstances, would meet with difficulty before a court and jury, in disturbing one in possession under a valid subsequent title. On the question of abandonment, there is a great difference between

the case of him who defends his possession under the act, and of him who asserts his claim for the first time, after a delay of thirty or forty years, and after a town, as in this instance, has been built upon the land. We must not shut our eyes to the state of things prior to, and at the date of, the act of 1812, and that which now exists. At the former period, many lots were of little or no value, and the presumption of their having been abandoned was no more unreasonable than presuming an old hat or coat had been thrown away. The country was unsettled. The number of inhabitants bore no proportion to the quantity of land, which might be had at any time by asking for it. Now that these lots have attained their present enormous value, after costly improvements have been made upon them, it is an easy matter to set up the pretence that they never were abandoned, when, but for their enhanced value, a claim to them would not have been heard of. If a man has a thing of little or no value, which he leaves and never does any thing with for thirty or forty years, is there any hardship in presuming an abandonment of it, especially in favor of one who has paid a full consideration for it, and after it has been increased in value a thousand fold? Jurors should not close their eyes to the circumstances by which they are surrounded. They must know that the unprecedented rise in the value of real estate here has sent speculators in all directions seeking for those who may possibly have had a claim to land in St. Louis, and their descendants; informing them of claims of which they had never before heard; purchasing them for little or nothing, and then suing in their names to the ruin of honest and industrious men. It is obvious from the state of things existing here, that the interests of society—and it is in harmony with the law—require that, in trying claims under the act of 1812, jurors should be liberal in indulging a presumption of abandonment against claims which have been long neglected, and whose only support is on slight oral evidence of inhabitation, cultivation or possession sixty or seventy years before they were asserted.

These observations have been induced by the facts set forth

in the record, showing an attempt of the plaintiffs, with their title, to overcome that of the Schools. How the case would stand were the plaintiffs seeking to recover from one who relied solely on the title derived from their ancestor, we will not undertake to determine, as we do not know that the question is in the record ; for, from the arrangement made, it seems that the result of the suit as to the Schools is to determine the fate of the other defendants.

Other cases may present different phases. In controversies of this kind, it is obvious that each case must be determined by its own circumstances, mingled with the consideration that a mistrust of all claims that have long been dormant is inculcated by our law.

We are of the opinion that the court below erred in rejecting the extracts from the *Livre Terrein*. These extracts were important to show that, under the Spanish government, it was not unusual for the inhabitants to abandon their possessions. The jury which tried the cause were living under our system of laws, where such a thing as abandoning the right, title or claim to real estate is not known. Hence, in determining a question of abandonment under another government and a different state of titles, it was material for them to know that the practice of abandoning possessions was not unusual. Not that an abandonment by one is proof of an abandonment by another, but that such a thing was practiced. A jury acting under a system or law where such a thing as an abandonment is not known, in determining the question whether an abandonment took place under a former government in times long past, may take into consideration the fact that abandonments were not unusual, as furnishing some evidence as to the probability of an abandonment having taken place in a particular instance. The idea of an abandonment being foreign to the notions of our jurors, it was right not only that they should know that there was a law on the subject, but that acts of abandonment did actually take place. As the fact was an ancient one, and one that transpired under another government, the jury should have been put in the

same situation, as to knowledge of surrounding circumstances, as their own experience and observation would have furnished had they been trying a fact which occurred in their own times and under their own government.

Judge Ryland concurring, the judgment will be reversed, and the cause remanded.